[No. B039628. Second Dist., Div. Two. Feb. 22, 1990.]

SAUL LEFF et al., Plaintiffs and Appellants, v.
CITY OF MONTEREY PARK et al., Defendants and Respondents;
CHINESE-AMERICAN GOLDEN AGE ASSOCIATION et al., Real
Parties in Interest and Respondents.

**COUNSEL**

Gronemeier, Barker & Huerta, Christopher A. Sutton, Nicholas George Rodriguez and Gail Ivens for Plaintiffs and Appellants.

Brown, Winfield & Canzoneri and Thomas D. Green for Defendants and Respondents

Lewis, D'Amato, Brisbois & Bisgaard, Eric Nelson Lindquist and Robert L. Toms, Jr., for Real Parties in Interest and Respondents.

**OPINION**

**COMPTON, Acting P. J.**—Petitioner John Nugen, along with others, filed a verified petition seeking ordinary mandamus (Code Civ. Proc., § 1085), administrative mandamus (Code Civ. Proc., § 1094.5), and declaratory relief. The petition sought to prevent respondents City of Monterey Park (City) et al., from granting real parties in interest, Chinese-American Golden Age Association (Association) et al., permission to develop a "home for the aged" in a neighborhood zoned R-2.[1] Association thereafter filed a demurrer directed solely at Nugen, challenging his standing to sue on the ground that he had failed to exhaust his administrative remedies before commencing the action. The trial court agreed and sustained the demurrer against him without leave to amend. This appeal follows. We reverse.[2]

█ It is axiomatic, of course, that in reviewing the sufficiency of a complaint an appellate court must "treat the demurrer as admitting all material facts properly pleaded but not contentions, deductions or conclu-

---

[1] The other petitioners, who are not parties to this appeal but remain litigants below, are Saul Leff and Phyllis Rabins. The respondents additionally include the Monterey Park City Council (City Council) and the City's Planning Commission (Planning Commission). Dr. Frances Wu, Association's president, is also a real party in interest.

[2] On appeal, the municipal parties have responded to Nugen's contentions by adopting the arguments set forth in Association's respondent's brief.

sions of fact or law. The allegations of the complaint and attached exhibits therefore must be accepted as true. [Citations.] Unless clear error or abuse of discretion is demonstrated, however, the trial court's judgment of dismissal following the sustaining of a demurrer will be affirmed on appeal. [Citations.]" (*Loehr* v. *Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1076-1077 [195 Cal.Rptr. 576].) ■ "A general demurrer is a vehicle whereby the entire pleading to which it is addressed is searched to find any material and necessary allegation to be missing." (*Seidner* v. *1551 Greenfield Owners Assn.* (1980) 108 Cal.App.3d 895, 903 [166 Cal.Rptr. 803].)

Applying the aforementioned rules, the record reveals that in 1987 Association desired to construct a "home for the aged" at 321 North Orange Avenue in Monterey Park, an area classified as an R-2 zone.[3] At the time, however, the zoning code limited such establishments to R-3 zones. In September 1987, Association applied to the Planning Commission for a zoning code amendment allowing the development of homes for the aged in the R-2 zones citywide. Association also sought certain building variances and the issuance of a conditional use permit.[4]

On September 17, 1987, City personnel published notices in the Monterey Park Progress, a community newspaper of general circulation, announcing that the Planning Commission would consider Association's application at a public hearing on October 1, 1987.[5]

Apparently, the Planning Commission tabled consideration of the application until its October 22, 1987, public hearing.[6] On that date, members of

---

[3] City's Municipal Code section 21.04.375 defines a "home for the aged" as a facility for six or more ambulatory aged persons, which must be licensed as such by the State of California, and may provide no medical facilities or services on the premises.

Association's proposed complex would stand three stories in height and consist of one hundred rooms plus facilities for dining, recreation and other activities. The patrons of the facility would be elderly but ambulatory.

[4] The variances sought by Association included permission to (1) limit the rear yard to 15 feet instead of the required 25 feet; (2) furnish only 26 parking spaces rather than the minimum number of 50; (3) place a 6-foot wrought iron wall fence in the front yard; (4) extend the building length to 149 feet instead of the permitted 60 feet; (5) allow architectural projections of 36 inches in the front yard, side street and rear balconies rather than the maximum permitted 30 inches; and (6) construct the building to a height of 3 stories instead of the maximum permitted limit of 2 stories or 30 feet.

[5] The notices stated, "ANY interested individual may appear in person or by agent at such hearing and be heard on any matter relevant to such proceedings. Any written material must be presented by the author at the public hearing." The newspaper also published on October 1, 1987, a notice that the City Council would hold a public hearing on October 12, 1987, to consider Association's application to amend the zoning code.

[6] The record indicates, however, that on October 14, 1987, the Monterey Park Progress published a notice stating, in part, that the City Council "will hold a public hearing on the

the general public, including Nugen's copetitioners below, Saul Leff and Phyllis Rabins, appeared at the proceeding. During the hearing, Leff and Rabins raised several objections, including that the Planning Commission had failed to give proper notice of the meeting; that granting the variance would violate a height-restriction ordinance passed by the voters in a municipal election held two days earlier;[7] and that the project would have an adverse impact on the City's sewer system and other public utilities.

Despite the objections to the facility, the Planning Commission voted unanimously to grant all but the height variance. The latter, however, passed by a three-to-two vote. The Planning Commission also voted four to one to issue a conditional use permit and to promulgate a negative declaration stating that the project would not have an adverse effect on the environment. The Planning Commission further voted four to one to recommend to the City Council that it approve the zoning amendment sought by Association.

On October 26, 1987, Leff and Rabins attended a City Council meeting and again voiced their objections to the facility. The City Council, however, postponed its vote to amend the zoning code to a later date.

Thereafter, Association notified the City Council on November 3, 1987, that it no longer wished to pursue its application to amend the zoning code. At the same time, Leff was attempting to organize support for an appeal of the Planning Commission's decision.[8] He abandoned his effort, however, after being informed by City personnel that Association had withdrawn its application.[9]

---

26th day of October 1987 . . . SAID hearing was initiated by the City Council . . . and is for the purpose of appealing the decision of the Planning Commission approving a Conditional Use Permit and Variances. . . ."

[7] The ballot measure, Proposition D, provided: "The people of the City of Monterey Park do hereby ordain as follows: [¶] *Section 1.* No height variance shall be granted within the City of Monterey Park which would permit the construction of an additional story above the number of stories which is permitted by the Monterey Park Zoning Code or would allow construction to exceed the maximum heights permitted by the Monterey Park Zoning Code by more than six (6) feet. [¶] *Section 2.* This ordinance shall become effective November 6, 1987."

[8] Monterey Park Zoning Code section 21.70.130 provides that "[t]he applicant, or any other person who owns real property or resides within 300 feet of the property lines of the property to which the variances or conditional use permit application relates, and who is aggrieved by the decision of the planning commission in conjunction with action taken on the variance or conditional use permit, may file a written letter of appeal with the city clerk together with a filing and processing fee as provided by a resolution by the council, prior to the commission's action becoming final, appealing the decision of the planning commission to the city council."

[9] Leff and Rabins also attended the November 9, 1987, the City Council meeting at which time the application was formally terminated.

Having reconsidered its decision, Association, on December 7, 1987, notified the City Council that it desired to reactivate its application for a zoning code amendment. The application was granted and, on December 31, 1987, notices were published announcing a public hearing and extending the date to file an appeal from the Planning Commission's decision.[10]

On January 11, 1988, the City Council held a public hearing concerning Association's application. Both Leff and Rabins appeared at that hearing and objected to the project and the manner in which the application had been reactivated.[11] Following debate on the matter, the City Council passed the zoning amendment three to zero with one abstention.

On January 15, 1988, Leff and Nugen filed with the City Council separate requests for appeals of the Planning Commission's decision to grant the variances and issue the conditional use permit.[12] On January 18, 1988, City notified Leff that under municipal law he had no right to appeal the Planning Commission's decision because he did not reside or own property within 300 feet of the project. The City further rejected the request on the

---

[10] The first notice stated: "NOTICE OF EXTENDED APPEAL PERIOD ON PROPOSED VARIANCES AND CONDITIONAL USE PERMIT FOR 321 NORTH ORANGE AVENUE. APPLICATION for a Conditional Use Permit and Variances was filed with the City of Monterey Park by the Chinese Golden Age Association . . . to allow construction of a 100 room home for the aged. . . . [¶] SAID petitions were considered by the Planning Commission at their meeting of October 22, 1987, and approved subject to conditions. Applicant withdrew the petition three days prior to the end of appeal period, but has since requested reopening the application. [¶] AN ADDITIONAL THREE DAY APPEAL PERIOD WILL BE AVAILABLE JANUARY 4-6, 1988. . . . [¶] SAID APPEAL MUST BE FILED JANUARY 4, 5, 6, 1988 IN THE CITY CLERK'S OFFICE. . . ."

The second announcement provided: ". . . NOTICE OF PUBLIC HEARING. NOTICE is hereby given that the City Council of the City of Monterey Park will hold a Public Hearing on the 11th day of January 1988. . . . [¶] Said hearing was initiated by [Association] . . . and is for the purpose of amending the Zoning Code of this City and in particular Chapter 21.70.030, to consider an amendment to Conditional Use Permit regulations to allow a home for the aged (more than six people) when adjacent to senior citizen housing in the R-2 zone. . . . [¶] ANY interested individual may appear in person or by agent at such hearing and be heard on any matter relevant to such proceedings."

[11] Their specific objections included that the project violated the height restrictions passed by the voters in the October 20, 1987, municipal election. They also asserted that the facility would overtax the sewer system and increase population density.

[12] Both requests for an appeal stated the following: "[The requests are timely filed] due to the withdrawal of the application of [Association] by letter dated November 3, 1987, prior to the end of the appeal period and as provided for in the Monterey Park Municipal Code. No provision exists for re-instituting an application once it has been withdrawn. A new application would require a new filing fee and review by the Planning Commission. No new application was filed and no fee paid. The November 3, 1987 withdrawal was communicated to the public by the City of Monterey Park as terminating the application and in reasonable reliance on this communication no appeal was filed by November 6, 1987. Without authority from the Monterey Park Municipal Code and without approval of either the Planning Commission or [the City Council] a limited and illegal appeal notice was published December 31, 1987, of which the above appellant was unaware."

ground that it was not timely filed. At the same time, the City also rejected Nugen's request.

Nugen and his copetitioners commenced the present action on January 26, 1988. The petition sought, among other things, an order requiring that their appeal of the Planning Commission's decision be heard by the City Council. The pleading also sought a declaration that the variances and conditional use permits granted and issued to Association were illegal. Additionally, the petition further requested an order commanding the City Council to repeal Municipal Code section 21.70.120, which limits appeal rights to those persons owning property or residing within 300 feet of the proposed project.

Association thereafter filed a demurrer to Nugen's second amended petition on the ground that Nugen, who never appeared before either the Planning Commission or the City Council, had failed to allege that he had exhausted his administrative remedies before initiating his action. Association also made a motion that the trial court take judicial notice of the fact that City records indicated that all persons living or residing within 300 feet of the project were served by mail with notice of the land use proceedings.

Nugen opposed the demurrer, contending that his failure to appear before the Planning Commission or the City Council was due to the fact that he never received notice of the administrative proceedings. The trial court, however, rejected Nugen's argument stating: "Well, the City Council or governmental agency doesn't have to give personal notice to everyone. There's constructive notice to him." The trial court then sustained the demurrer on the ground that Nugen had neglected to exhaust his administrative remedies.

On appeal we agree with Nugen's contention that he has alleged facts bringing him within an exception to the exhaustion doctrine.

■ "When administrative machinery exists for the resolution of differences, the courts will not act until such administrative procedures are fully utilized and exhausted. To do so would be in excess of their jurisdiction. [Citations.]" (*Horack* v. *Franchise Tax Board* (1971) 18 Cal.App.3d 363, 368 [95 Cal.Rptr. 717].) Because the rule is jurisdictional, the doctrine is not open to judicial discretion. (*California Aviation Council* v. *County of Amador* (1988) 200 Cal.App.3d 337, 341 [246 Cal.Rptr. 110].) The rule is applicable whether the petitioner is seeking ordinary mandamus (*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 7 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]) or administrative mandamus. (*Ralph's Chrysler-Plymouth*

v. *New Car Dealers Policy & Appeals Bd.* (1973) 8 Cal.3d 792, 794 [106 Cal.Rptr. 169, 505 P.2d 1009].)

The rationale for the doctrine has been variously stated. "The requirement of exhaustion of administrative remedy is founded on the theory that the administrative tribunal is created by law to adjudicate the issue sought to be presented to the court, and the issue is within its special jurisdiction." (*California Aviation Council* v. *County of Amador, supra,* 200 Cal.App.3d at pp. 340-341.) The rule affords the public agency an "opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review." (*Coalition for Student Action* v. *City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [200 Cal.Rptr. 855], italics omitted.) Thus, by presenting the issue to the administrative body, the agency "will have had an opportunity to act and render the litigation unnecessary" (*Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794]); and, in so doing, "lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the desired relief. [Citations.]" (*Duffy* v. *Bd. of Equalization* (1984) 152 Cal.App.3d 1156, 1163 [199 Cal.Rptr. 886].) Finally, the doctrine "is viewed with favor . . . because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency." (*Karlin* v. *Zalta* (1984) 154 Cal.App.3d 953, 980 [201 Cal.Rptr. 379].)

█ We think that by alleging his copetitioners repeatedly appeared before the administrative bodies below and asserted the objections which are the basis of his action, Nugen has stated facts which satisfy the intent of the exhaustion of remedies doctrine. In *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], plaintiffs filed a class action attacking the issuance by the Mono County Planning Commission of a conditional use permit without first requiring the applicant to submit an environmental impact report. Although two local property owners, who were members of the class represented by the named plaintiffs, had appealed the decision to the county board of supervisors, the named plaintiffs had failed to personally raise their objections to the administrative body before commencing the litigation. The defendants on appeal therefore argued that the action should be dismissed because "[the Board of Supervisors] is entitled to learn the contentions of interested parties before the litigation is instituted." (*Id.* at p. 267.)

In response to the defendants' position, the high court stated: "If those unnamed plaintiffs in the class suit have previously sought administrative relief they will have expressed the position of the representative plaintiff in the class suit, and the Board will have had its opportunity to act and to

render litigation unnecessary, if it had chosen to do so. [¶] . . . Since two plaintiffs, albeit unnamed plaintiffs, have previously appeared before the Board, the policies of the exhaustion doctrine have been fulfilled. . . . Defendant Board has had the opportunity to hear arguments of interested property owners. . . . Nothing more could effectuate the policy of the exhaustion doctrine. To require [the named plaintiffs] to have personally appeared, in addition to the others, . . . would serve no additional useful purpose." (8 Cal.3d at pp. 267-268; see also *Harrison* v. *Board of Supervisors* (1975) 44 Cal.App.3d 852 [118 Cal.Rptr. 828].)

Association contends, however, that the rationale of *Mammoth* is inapplicable to the present case because Nugen failed to commence his litigation as a class action. We think that is a distinction without a difference. Leff and Rabins reside and own property in City. As such, had Nugen brought a class action, they would have clearly fallen within the represented group because they share with him "a community of interest" in challenging the decisions of the municipality's agencies. As the *Mammoth* court noted: "[I]n most instances those individuals who have a sufficient interest in the subject matter to seek administrative review will possess the community of interest with others to justify inclusion in the group represented in a subsequent class action." (*Friends of Mammoth* v. *Board of Supervisors, supra*, 8 Cal.3d 247, 267.)

The judgment is reversed. Nugen to recover his costs on appeal.

Gates, J., and Fukuto, J., concurred.