[Nos. C007450, C007941. Third Dist. Jan. 17, 1992.]

CITY OF SACRAMENTO et al., Plaintiffs and Respondents, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Appellants.

**COUNSEL**

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, R.H. Conett, Assistant Attorney General, and Kathleen E. Gnekow, Deputy Attorney General, for Defendants and Appellants.

James P. Jackson and Sharon Seidorf Cardenas, City Attorneys, William P. Carnazzo, Lawrence M. Lunardini and Richard E. Archibald, Deputy City Attorneys, Remy & Thomas, Tina A. Thomas, Robert H. Thompson and James G. Moose for Plaintiffs and Respondents.

## OPINION

**PUGLIA, P. J.**—In this appeal we consider whether annual rice pesticide plans devised by the California Department of Food and Agriculture (DFA) for implementation in California's Central Valley are subject to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; hereafter CEQA).

The State Water Resources Control Board (State Board), Regional Water Quality Control Board for the Central Valley Region (Regional Board) and DFA (hereafter collectively defendants) appeal from a judgment of the superior court granting a writ of mandate requiring the Regional Board to comply with CEQA in connection with its review and approval of these annual plans. On appeal, defendants contend the trial court lacked jurisdiction to issue the writ because the plaintiffs failed to exhaust their administrative remedies. They further contend CEQA is inapplicable to the Regional Board's review because DFA is the appropriate lead agency and its pesticide regulatory duties are exempt from CEQA. Finding merit in this latter contention, we shall reverse.

### I

We begin with a brief discussion of the interrelation between California water quality law and the law regulating the agricultural use of pesticides and herbicides, particularly as it applies to rice farming. The Porter-Cologne Water Quality Control Act (Wat. Code § 13000 et seq.; hereafter the Porter-Cologne Act) establishes a coordinated statewide program of water quality control overseen by the State Board and administered by nine regional boards. (Wat. Code, §§ 13140, 13200 et seq.) Under the Porter-Cologne Act, the regional boards are required to formulate water quality control plans for the state's 16 water basins. (Wat. Code, § 13240.) These "basin plans" are then subject to review by the State Board (Wat. Code, §§ 13245, 13246) and, when approved, are binding on all state offices, departments and boards whose activities may affect water quality (Wat. Code, § 13247).

Any person or entity discharging or proposing to discharge waste which could affect water quality must file a report with the appropriate regional

board. (Wat. Code, § 13260.) The regional board may then prescribe discharge requirements consistent with water quality objectives contained in the applicable basin plan. (Wat. Code, §§ 13263, 13377.) In the event of threatened or actual discharges in violation of requirements prescribed by a regional board, the board may issue cease and desist orders. (Wat. Code, § 13301.)

The Central Valley Region contains three water basins: the Sacramento River Basin, the Sacramento-San Joaquin Delta Basin, and the San Joaquin Basin. In 1975, the Regional Board formulated, and the State Board approved, a water quality plan covering these three basins. Among the objectives in this plan for the Sacramento-San Joaquin Delta Basin is the following: "The total concentration of all pesticides shall not exceed 0.6 [parts per billion (ppb)] as determined by the summation of individual pesticide concentrations."

DFA is invested by law with the responsibility for regulating the production and use of pesticides and herbicides throughout the state. Under division 6 (Pest Control Operations) and portions of division 7 (Agricultural Chemicals, Livestock Remedies, and Commercial Feeds) of the Food and Agriculture Code, DFA is directed "[t]o provide for the proper, safe, and efficient use of pesticides essential for production of food and fiber and for protection of the public health and safety." (Food & Agr. Code, § 11501, subd. (a).) DFA is further directed to "protect the environment from environmentally harmful pesticides by prohibiting, regulating, or controlling uses of such pesticides" and "encourage the development and implementation of pest management systems, stressing application of biological and cultural pest control techniques with selective pesticides when necessary to achieve acceptable levels of control with the least possible harm to nontarget organisms and the environment." (Food & Agr. Code, § 11501, subds. (b), (f).)

In addition to responsibility for licensing and regulation of pesticide applicators (Food & Agr. Code, § 11401 et seq.) and control of pesticide residue on produce (Food & Agr. Code, § 12501 et seq.), DFA is empowered to register all economic poisons, including pesticides and herbicides. (Food & Agr. Code, § 12811 et seq.) As part of this registration process, DFA is directed to "eliminate from use in the state any economic poison which endangers the agricultural or nonagricultural environment, is not beneficial for the purposes for which it is sold, or is misrepresented." (Food & Agr. Code, § 12824.) Restrictions may be placed on the use of a particular economic poison, including "limitations on quantity, area and manner of application." (Food & Agr. Code, § 12824.) DFA is also empowered to

cancel the registration of an economic poison "[f]or which there is a reasonably effective and practicable alternate material or procedure which is demonstrably less destructive to the environment." (Food & Agr. Code, § 12825, subd. (c).)

Chapter 3 of division 7 of the Food and Agriculture Code (§ 14001 et seq.) concerns the regulation of restricted materials. Restricted materials are designated by DFA based on various criteria, including "[d]anger of impairment of public health," "[h]azard to the environment from drift onto streams, lakes, and wildlife sanctuaries," and "[h]azards related to persistent residues in the soil resulting ultimately in contamination of the air, waterways, estuaries or lakes, with consequent damage to fish, wild birds, and other wildlife." (Food & Agr. Code, § 14004.5, subds. (a), (d), & (e).) DFA is mandated to adopt regulations which "shall prescribe the time when, and the conditions under which, a restricted material may be used or possessed in different areas of the state, and may prohibit its use or possession in those areas." (Food & Agr. Code, § 14006.) No restricted material may be used without a permit issued by a DFA commissioner. (Food & Agr. Code, § 14006.5.)

Rice farming in the Central Valley Region involves the use of flooded fields on which pesticides are applied to control the growth of water grasses and plant pests. These flooded fields containing pesticides eventually drain into the Sacramento River. Three of the pesticides used in rice farming, bentazon (Basagran), molinate (Ordram), and thiobencarb (Bolero), have been designated by DFA as restricted materials subject to regulation. (Cal. Code Regs., tit. 3, § 6400, subd. (n) (10), (11), (12).) This regulation includes not only the application of these pesticides but also the later discharge of pesticide laden water from rice fields into the Sacramento River.[1]

---

[1]For example, the discharge of water containing bentazon has been limited by DFA as follows:

"(a) Bentazon (Basagran) shall be used only under the following conditions when applied to rice fields in Butte, Colusa, Glenn, Placer, Sacramento, Sutter, Tehama, Yolo and Yuba Counties that are located within the watershed of the Sacramento River upstream from the 'I' Street bridge in Sacramento:

"(1) Water shall not be discharged from rice fields at the times of bentazon applications.

"(2) All water on rice fields treated with bentazon prior to August 1 shall be retained on each field or within water management systems capable of preventing direct or indirect discharge into the Sacramento River until the fields are drained for harvest.

"(3) All water on rice fields treated with bentazon after July 31 shall be retained on each field or within water management systems capable of preventing direct or indirect discharge into the Sacramento River until October 1.

"(b) The commissioner may authorize an emergency release of water, no sooner than ten days after a bentazon application, after reviewing a written request for such release from the

Each year, DFA prepares a plan of anticipated pesticide use in the Central Valley (rice pesticide plan) for the upcoming rice growing season and submits this plan to the Regional Board for review. After a rice pesticide plan is approved by the Regional Board, it is implemented through DFA's regulation and permit powers.

## II

At the December 11, 1987, meeting of the Regional Board, plaintiffs City of Sacramento (City), Lloyd Connelly (Connelly), and the Sacramento Environmental Health Coalition (SEHC) (hereafter collectively plaintiffs) presented comments regarding consideration of DFA's proposed 1988 rice pesticide plan.[2] City obtains its water supply for residential and other uses from the Sacramento River at a point within the Sacramento River Basin downstream from the discharge points used by rice growers in the Central Valley Region. Connelly is a state legislator and City resident. SEHC is an unincorporated association of individuals whose drinking water originates from the Sacramento River and "who have joined together to seek means to improve environmental quality in the Sacramento Region." Notwithstanding plaintiffs' comments, the Regional Board voted to approve the 1988 rice pesticide plan with certain conditions. At the January 29, 1988, Regional Board meeting, DFA indicated one of the conditions suggested by the Regional Board had been met.

On February 26, 1988, SEHC filed a petition with the State Board objecting to the 1988 rice pesticide plan and claiming the Regional Board "failed to comply with the environmental impact assessment procedures mandated by [CEQA]" before approving the program. On April 7, City filed a petition with the State Board in support of SEHC's petition. On April 12, the State Board notified City its petition was untimely but would be considered as comments by an interested person. However, the State Board took no further action on SEHC's petition until October 21, 1988, when SEHC was notified its petition would not be considered.

Plaintiffs filed this writ proceeding on April 21, 1989. In their petition, plaintiffs alleged defendants effected a de facto amendment to the 1975

owner, operator or authorized agent of the property which clearly demonstrates that rice yield on the affected property is threatened by the water management requirements of this section. Water may be released under such an authorization only to the extent necessary to mitigate the problem(s) affecting rice yield.

"(c) Bentazon may be applied to fields drained for harvest without additional water management requirements." (Cal. Code Regs., tit. 3, § 6484.)

[2]Defendants' request that we take judicial notice of the minutes of the relevant Regional Board hearings is granted. (Evid. Code, § 452, subd. (c).)

basin plan for the Sacramento-San Joaquin Delta Basin by repeatedly failing to enforce the 0.6 ppb objective for cumulative pesticide concentrations and are further attempting formally to amend the basin plan, in both instances without complying with CEQA. The petition sought an order requiring compliance with the 0.6 ppb objective and compliance with CEQA regarding these alleged amendments to the basin plan.

After extensive briefing and argument by counsel, the trial court entered an order granting a writ of mandate requiring the Regional Board "to institute proceedings and analysis pursuant to CEQA in connection with its review of the rice [pesticide plan] for 1990 and subsequent years." The order further required the Regional Board, in the event proposed discharges exceed the objective of 0.6 ppb, to include in its analysis of the plan any potentially significant environmental effects caused by failure to enforce the objective. In a subsequent order, the trial court granted $50,000 in attorney's fees to Connelly and SEHC. Defendants' appeals from that order and from the judgment granting mandate relief have been consolidated.

### III

■ We first address defendants' suggestion this matter has been rendered moot by subsequent Regional Board action. On January 26, 1990, the Regional Board issued Resolution No. 90-028 eliminating the 0.6 ppb water quality objective for the Sacramento-San Joaquin Delta Basin and setting new objectives. On February 15, 1990, the State Board approved this amended basin plan.[3] However, the writ of mandate issued by the trial court is not limited to enforcement of the 0.6 ppb cumulative pesticide objective. The judgment appealed from orders issuance of a writ requiring the Regional Board to comply with CEQA in connection with each annual review of a rice pesticide plan beginning in 1990. Annual review by the Regional Board presumably will continue regardless of a change in the water quality objectives sought to be attained. This matter is therefore not moot.

### IV

Defendants contend the trial court lacked jurisdiction to consider plaintiffs' writ petition because plaintiffs failed to exhaust their administrative

---

[3]We take judicial notice of this court's file in *City of Sacramento* v. *State Water Resources Control Board et al.*, 3 Civ. C004951. In that action we took judicial notice of several exhibits submitted by appellants in their motion to dismiss the appeal. Exhibit 2 is a copy of Regional Board Resolution No. 90-028. Exhibit 3 is a copy of the State Board resolution approving the amended plan.

remedies. Under the exhaustion doctrine, "where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715].) This is a jurisdictional prerequisite, not a matter of judicial discretion (*id.* at p. 293), and applies to actions seeking both ordinary and administrative mandamus (*Leff* v. *City of Monterey Park* (1990) 218 Cal.App.3d 674, 680-681 [267 Cal.Rptr. 343]). The exhaustion doctrine is codified in CEQA in Public Resources Code section 21177.[4]

Defendants contend plaintiffs failed to exhaust their administrative remedies by not seeking review by the State Board within 30 days of the Regional Board's decision approving the 1988 rice pesticide plan. Water Code section 13320 permits "[a]ny aggrieved person" to petition the State Board for review within 30 days of certain action or inaction by a regional board. Plaintiffs counter that Water Code section 13320 is inapplicable because their claims are based on CEQA, not the Porter-Cologne Act. In *Committee for a Progressive Gilroy* v. *State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847 [237 Cal.Rptr. 723], this court held the CEQA statute of limitations applies when review is sought on CEQA grounds. Under CEQA, an action is timely if brought within 180 days of public agency approval, without CEQA review, of a project which might have a significant effect on the environment. (Pub. Resources Code, § 21167, subd. (a).) However, this statutory period applies only to actions seeking review by a superior court *after* available administrative remedies have been exhausted. Consideration of whether such exhaustion has occurred in a given case will depend upon the procedures applicable to the public agency in question.

The parties focus their arguments regarding internal review procedures on the timeliness of petitions filed by plaintiffs with the State Board. However, this presupposes the water boards are the appropriate agencies for CEQA compliance in this instance. As we shall explain, this assumption is unwarranted.

## V

CEQA embodies a comprehensive statutory scheme requiring environmental analysis of discretionary projects proposed to be carried out or

---

[4]Section 21177 reads in relevant part: "(a) No action may be brought pursuant to Section 21167 [setting limitations periods for various CEQA claims] unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person. [¶] (b) No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing. . . ."

approved by public agencies. (Pub. Resources Code, § 21080, subd. (a).) The underlying purpose of the act is "to compel government at all levels to make decisions with environmental consequences in mind." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].)

Under CEQA, a "lead agency" is required to determine whether an environmental impact report (EIR) will be required for a given project (Pub. Resources Code, § 21080.1) and, if so, to seek input from other agencies regarding the desired content of such report (Pub. Resources Code, §§ 21080.4, subd. (a), 21104). The lead agency must then prepare the EIR and include it in any report on the project. (Pub. Resources Code, § 21105; *Bakman* v. *Department of Transportation* (1979) 99 Cal.App.3d 665, 679 [160 Cal.Rptr. 583].) If, however, the lead agency determines an EIR is unnecessary because the proposed project will not have a significant effect on the environment, it must prepare a "negative declaration" to that effect. (Pub. Resources Code, § 21080, subd. (c).)

Under CEQA, "lead agency" is defined as "the public agency which has the *principal* responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Pub. Resources Code, § 21067, italics added.) By contrast, a "responsible agency" is defined as "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (Pub. Resources Code, § 21069.) Where a lead agency is obligated under CEQA to prepare an EIR, a responsible agency is obligated to consider such report prior to approving a project. (Pub. Resources Code, § 21061.)

Under certain conditions, a responsible agency which is called upon to approve a project may be required to step into the shoes of the lead agency. This can occur where the lead agency has not prepared environmental documents, the documents prepared are inadequate or subsequent environmental documents are required. (Cal. Code Regs., tit. 14, § 15052, subd. (a).)[5] The responsible agency will then be required to assume the duties of the lead agency.

---

[5]California Code of Regulations, title 14, section 15052, subdivision (a) provides:

"Where a responsible agency is called on to grant an approval for a project subject to CEQA for which another public agency was the appropriate lead agency, the responsible agency shall assume the role of the lead agency when any of the following conditions occur:

"(1) The lead agency did not prepare any environmental documents for the project, and the statute of limitations has expired for a challenge to the action of the appropriate lead agency.

■ Assuming an annual rice pesticide plan is a "project" under CEQA, as the trial court found, defendants contend DFA, not the Regional Board, is the lead agency for preparation of an EIR because DFA is primarily responsible for pesticide regulation. Plaintiffs counter that, while DFA may be primarily responsible for regulating pesticide application, the Regional Board is primarily responsible for regulating the discharge of pesticides into waters of the Central Valley Region.

Regulations promulgated by the Secretary of the Resources Agency pursuant to CEQA establish criteria for determining the lead agency for a given project. Where the project is to be carried out by nongovernmental entities, the lead agency will normally be the public agency "with the greatest responsibility for supervising or approving the project as a whole." (Cal. Code Regs., tit. 14, § 15051, subd. (b).) Usually this is the agency with the broadest governmental powers. (Cal. Code Regs., tit. 14, § 15051, subd. (b)(1).) However, where two or more public agencies have relatively equal responsibility, "the agency which will act first on the project in question shall be the lead agency." (Cal. Code Regs., tit. 14, § 15051, subd. (c).) This is consistent with the legislative goal of assuring environmental impact assessment in governmental planning at the earliest possible time. (*Citizens Task Force on Sohio* v. *Board of Harbor Comrs.* (1979) 23 Cal.3d 812, 814 [153 Cal.Rptr. 584, 591 P.2d 1236].) Where the identity of the lead agency cannot be determined by the foregoing criteria, the possible candidates may simply agree among themselves which will be the lead agency. (Cal. Code Regs., tit. 14, § 15051, subd. (d).)

■ Before examining the roles of the various agencies involved in the project under consideration here, it is necessary to understand the scope of that "project." CEQA defines a project variously as "(a) Activities directly undertaken by any public agency. [¶] (b) Activities undertaken by a person which are supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c)

---

"(2) The lead agency prepared environmental documents for the project, but the following conditions occur:

"(A) A subsequent EIR is required pursuant to [California Code of Regulations, title 14,] [s]ection 15162,

"(B) The lead agency has granted a final approval for the project, and

"(C) The statute of limitations for challenging the lead agency's action under CEQA has expired.

"(3) The lead agency prepared inadequate environmental documents without consulting with the responsible agency as required by [California Code of Regulations, title 14,] [s]ections 15072 or 15082, and the statute of limitations has expired for a challenge to the action of the appropriate agency."

*Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."* (Pub. Resources Code, § 21065, italics added.)

The regulations further define a project as "the whole of an action, which has a potential for resulting in a physical change in the environment . . . ." (Cal. Code Regs., tit. 14, § 15378, subd. (a).) It is "the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c); *Committee for a Progressive Gilroy* v. *State Water Resources Control Bd., supra*, 192 Cal.App.3d at p. 863.)

Under the foregoing definition, the issuance of each permit for the use of pesticides or discharge of pesticide laden water might be considered a project. Instead, however, DFA and the Regional Board have devised a coordinated scheme to regulate the amount of pesticides used by rice farmers and discharged into the Sacramento River on an annual basis. DFA's formulation of an annual rice pesticide plan includes consideration of the environmental effects of the overall amount of pesticides to be used. The Regional Board's subsequent review and approval of such plan includes environmental consideration of the total discharge of pesticide-laden water. In this way, the environmental and other considerations associated with a given permit are subsumed within the broader considerations associated with the annual plan.

The project in question here is not simply the Regional Board's approval of an annual rice pesticide plan.[6] It is the formulation, approval and implementation of that plan which together have the potential for causing physical change to the environment. And because the application of pesticides to rice fields pursuant to an annual rice pesticide plan presupposes the discharge of pesticide residue into the Sacramento River, it is this entire process which

---

[6]There is some question whether the Regional Board actually approves a rice pesticide plan or merely provides guidance to DFA on the water quality effects of such plan. The statutory and regulatory scheme contains no provision for water board approval of the annual plans. This is not surprising since there are also no provisions directly authorizing DFA's formulation or use of a rice pesticide plan in lieu of individual permit considerations.

Because the parties approach this matter as if the Regional Board is engaged in an approval process rather than simply consultation, and because the minutes of the Regional Board's hearing on the matter contain a motion to "approve" the DFA plan (we take judicial notice of the minutes of the Regional Board hearing of December 11, 1987, pursuant to Evidence Code section 452, subdivision (c)), we shall assume this is the process undertaken.

must be considered for environmental impact purposes. This entire process is the project. (Cal. Code Regs., tit. 14, § 15378, subd. (a).)

 We next consider the question of lead agency identification. Despite plaintiffs' contention that DFA's responsibility over pesticide regulation does not extend to regulating discharges into state waters, the statutory scheme described above establishes concomitant responsibility in DFA and the Regional Board for protecting state waters from pesticide pollution. The Regional Board's responsibility is to protect state waters from *all* forms of pollution, while DFA's responsibility is limited to pesticide pollution. However, DFA's responsibility extends beyond water pollution to include the *total* environment. Thus, because the underlying purpose of an EIR is to analyze and inform regarding adverse effects to the environment as a whole (Pub. Resources Code, § 21061), DFA is in the best position to make such an assessment.

As the author of a given pesticide plan, DFA would also be the first in time to consider its environmental impact. (See Cal. Code Regs., tit. 14, § 15051, subd. (c).) Furthermore, in 1982 the State Board issued a pesticide guidance report acknowledging DFA as the lead agency for pesticide use. The following year, the Governor issued Executive Order No. D-15-83 reconfirming DFA "as the lead agency for pesticide regulation" and charging that agency "with the responsibility of ensuring the orderly regulation of pesticides to preserve their beneficial uses while protecting the quality of the total environment."

For all the foregoing reasons, DFA is the logical choice for lead agency in connection with the annual rice pesticide plans.

VI

 We consider next DFA's obligation to comply with CEQA. In lieu of the requirement for preparing an EIR or negative declaration, CEQA provides a mechanism for the exemption of certain regulatory programs which themselves require a plan or other written documentation containing environmental information. (Pub. Resources Code, § 21080.5, subd. (a); *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 196 [132 Cal.Rptr. 377, 553 P.2d 537].) This exemption applies whenever a program has been certified by the Secretary of the Resources Agency. (Pub. Resources Code, § 21080.5, subd.

(c).) After certification, the internal plan or other documentation containing environmental information is used for review purposes in lieu of an EIR. (Pub. Resources Code, § 21080.5, subd. (a).)[7]

---

[7]Public Resources Code section 21080.5 provides in relevant part:

"(a) When the regulatory program of a state agency, board, or commission requires a plan or other written documentation, containing environmental information and complying with the requirements of paragraph (3) of subdivision (d), to be submitted in support of any of the activities listed in subdivision (b), the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division; provided, that the Secretary of the Resources Agency has certified the regulatory program pursuant to this section.

"(b) This section shall apply only to regulatory programs or portions thereof which involve either of the following:

"(1) The issuance to a person of a lease, permit, license, certificate, or other entitlement for use.

"(2) The adoption or approval of standards, rules, regulations, or plans for use in the regulatory program.

"(c) A regulatory program certified pursuant to this section is exempt from the provisions of Chapter 3 (commencing with Section 21100) and Chapter 4 (commencing with Section 21150) and Section 21167.

"(d) In order to qualify for certification pursuant to this section, a regulatory program shall require utilization of an interdisciplinary approach which will ensure the integrated use of the natural and social sciences in decisionmaking and shall meet all of the following criteria:

"(1) The enabling legislation of the regulatory program shall:

"(i) Include protection of the environment among its principal purposes.

"(ii) Contain authority for the administering agency to promulgate rules and regulations for the protection of the environment, guided by standards set forth in the enabling legislation.

"(2) The rules and regulations adopted by the administering agency shall:

"(i) Require that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen any significant adverse impact which the activity may have on the environment.

"(ii) Include guidelines for the orderly evaluation of proposed activities and the preparation of the plan or other written documentation in a manner consistent with the environmental protection purposes of the regulatory program.

"(iii) Require the administering agency to consult with all public agencies which have jurisdiction, by law, with respect to the proposed activity.

"(iv) Require that final action on the proposed activity include the written responses of the issuing authority to significant environmental points raised during the evaluation process.

"(v) Require the filing of a notice of the decision by the administering agency on the proposed activity with the Secretary of the Resources Agency. Those notices shall be available for public inspection, and a list of the notices shall be posted on a weekly basis in the Office of the Resources Agency. Each list shall remain posted for a period of 30 days.

"(vi) Require notice of the filing of the plan or other written documentation to be made to the public and to any person who requests, in writing, notification. The notification shall be made in a manner that will provide the public or any person requesting notification with sufficient time to review and comment on the filing.

"(3) The plan or other written documentation required by the regulatory program shall:

"(i) Include a description of the proposed activity with alternatives to the activity, and mitigation measures to minimize any significant adverse environmental impact.

In 1978, the Legislature directed DFA to obtain certification of its pesticide regulatory program. (Stats. 1978, ch. 308, §§ 2-4, pp. 643-644.)[8] Pursuant to this directive, DFA's program was certified by the Secretary of the Resources Agency on December 28, 1979. (See *People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 481 [204 Cal.Rptr. 897, 683 P.2d 1150].) This certification includes: "(1) The registration, evaluation and classification of pesticides. [¶] (2) The adoption, amendment, or repeal of regulations and standards for the licensing and regulation of pesticide

"(ii) Be available for a reasonable time for review and comment by other public agencies and the general public.

"(e) The Secretary of the Resources Agency shall certify a regulatory program which the secretary determines meets all the qualifications for certification set forth in this section, and withdraw certification on determination that the regulatory program has been altered so that it no longer meets those qualifications. Certification and withdrawal of certification shall occur only after compliance with Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code.

" . . . . . . . . . . . . . . . . . . . . . ."

[8]Statutes 1978, chapter 308, reads in relevant part:

"Section 1. The Legislature finds that:

"(a) Agriculture is a major and essential component of California's economy.

"(b) The proper, safe, and efficient use of pesticides is essential for the protection and production of agricultural commodities and for health protection.

"(c) Timeliness in the application of pesticides is paramount in good pest management and is essential in the prevention of economic waste.

"(d) Reasonable environmental review of such pesticide use is prudent and appropriate.

"(e) Individual permits to apply pesticides must often be issued on short notice, thereby making impracticable the type of environmental review which would occur if the issuance of such permits was subject to the preparation of an environmental impact report or a negative declaration pursuant to the requirements of Division 13 (commencing with Section 21000) of the Public Resources Code.

"(f) Preparation of environmental impact reports and negative declarations for pesticide permits would be an unreasonable and expensive burden on California agriculture and health protection agencies.

"Sec. 2. The Legislature hereby declares that the procedures for governmental review of pesticide application and use shall not unnecessarily burden permit applicants or require such applicants to furnish unnecessary information.

"Sec. 3. In view of the findings of Section 1, the Legislature hereby declares that it is the policy of the State of California that environmental review of the pesticide regulatory program required by Division 6 (commencing with Section 11401) and by Chapters 1 (commencing with Section 12501), 2 (commencing with Section 12751), 3 (commencing with Section 14001), and 3.5 (commencing with Section 14101) of Division 7 of the Food and Agricultural Code should be achieved through the procedures established in Section 21080.5 of the Public Resources Code and not by requiring environmental impact reports or negative declarations in connection with the issuance of pesticide permits.

"Sec. 4. In order to effectuate the policy stated in Section 3 of this act, it is the intent of the Legislature that the Director of Food and Agriculture obtain certification of the pesticide regulatory program required by the provisions of the Food and Agricultural Code as set forth in Section 3 of the act pursuant to the provisions of Section 21080.5 of the Public Resources Code."

dealers and pest control operators and advisors. [¶] (3) The adoption, amendment, or repeal of regulations for standards dealing with the monitoring of pesticides and of the human health and environmental effects of pesticides. [¶] (4) *The regulation of the use of pesticides in agricultural and urban areas of the State through the permit system administered by the county agricultural commissioners.*" (Cal. Code Regs., tit. 14, § 15251, subd. (i), italics added.)

As previously discussed, DFA's annual preparation of a rice pesticide plan is the functional substitute for much of the analysis to be undertaken by county agricultural commissioners (commissioners) when awarding permits for pesticide use. The annual plan sets pesticide levels which are thereafter implemented by the commissioners. The annual plan is thus an integral part of DFA's pesticide regulation and permit system and must be considered as included within the Resource Secretary's certification. DFA is therefore exempt from CEQA compliance in the preparation of such plans.

SEHC and Connelly nevertheless contend the exemption provided by Public Resources Code section 21080.5 is limited in scope and does not relieve DFA of most of the requirements of CEQA or the need to prepare an EIR-like analysis of environmental impacts. They further contend the record contains no evidence DFA ever complied with these requirements. However, the relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence DFA *failed* to comply with the requirements of its pesticide regulatory program. In the absence of contrary evidence, we presume regular performance of official duty. (Evid. Code, § 664.) The record here contains no such contrary evidence.

Furthermore, the petition for relief presented to the trial court did not include allegations the annual rice pesticide plans did not comply with DFA's certified pesticide regulatory program or such program did not comply with Public Resources Code section 21080.5. Consequently, those issues are not before us. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 311, p. 321.)

Even presuming compliance by DFA with its certified program in preparing annual rice pesticide plans, the Regional Board is not necessarily relieved of responsibility to comply with CEQA. California Code of Regulations, title 14, section 15253 provides:

"(a) An environmental analysis document prepared for a project under a certified program listed in Section 15251 shall be used by another agency

granting an approval for the same project where the conditions in Subsection (b) have been met. In this situation, the certified agency shall act as lead agency, and the other permitting agencies shall act as responsible agencies using the certified agency's document.

"(b) The conditions under which a public agency shall act as a responsible agency when approving a project using an environmental analysis document prepared under a certified program in the place of an EIR or negative declaration are as follows:

"(1) The certified agency is the first agency to grant a discretionary approval for the project.

"(2) The certified agency consults with the responsible agencies, but the consultation need not include the exchange of written notices.

"(3) The environmental analysis document identifies:

"(A) The significant environmental effects within the jurisdiction or special expertise of the responsible agency.

"(B) Alternatives or mitigation measures that could avoid or reduce the severity of the significant environmental effects.

"(4) Where written notices were not exchanged in the consultation process, the responsible agency was afforded the opportunity to participate in the review of the property by the certified agency in a regular manner designed to inform the certified agency of the concerns of the responsible agency before release of the EIR substitute for public review.

"(5) The certified agency established a consultation period between the certified agency and the responsible agency that was at least as long as the period allowed for public review of the EIR substitute document.

"(6) The certified agency exercised the powers of a lead agency by considering all the significant environmental effects of the project and making a finding under Section 15091 for each significant effect.

"(c) Certified agencies are not required to adjust their activities to meet the criteria in Subsection (b). *Where a certified agency does not meet the criteria in Subsection (b):*

"(1) The substitute document prepared by the agency shall not be used by other permitting agencies in the place of an EIR or negative declaration, and

*"(2) Any other agencies granting approvals for the project shall comply with CEQA in the normal manner.* A permitting agency shall act as a lead agency and prepare an EIR or a negative declaration. Other permitting agencies, if any, shall act as responsible agencies and use the EIR or negative declaration prepared by the lead agency." (Italics added.)

However, as with compliance by DFA with its certified program, there is nothing in the record to suggest DFA failed to meet the criteria of subdivision (b) of the foregoing regulation and this was not claimed by the plaintiffs below nor asserted on appeal. We therefore presume compliance.

Thus, having concluded DFA is the lead agency for CEQA compliance in connection with the annual rice pesticide plans and that the record fails to establish DFA's noncompliance with its certified program or the other requirements of CEQA, we need not consider whether plaintiffs properly exhausted their administrative remedies before the water boards. However, for these same reasons, we conclude the trial court erred in mandating CEQA compliance by the Regional Board.

## VII

The last point raised by defendants on appeal relates to their request for sanctions for a frivolous writ petition. Defendants contend allegations in the petition regarding threats to drinking water from pesticide contamination are directly contradicted by the testimony of City's "top water quality expert" in an unrelated action.

We reject defendants' contention. Plaintiffs' claims regarding noncompliance with CEQA are not dependent upon proof of harm caused by rice pesticides. Nor are the allegations of the petition negated by testimony of a City employee in a totally unrelated matter. The trial court clearly did not err in denying sanctions.

## VIII

Because we reverse the judgment in the mandate proceeding, we must also reverse the award of attorneys fees to Connelly and SEHC. Code

of Civil Procedure section 1021.5 permits the award of attorneys fees only to a prevailing party. (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 292 [152 Cal.Rptr. 585].) Upon reversal of the judgment, Connelly and SEHC are no longer prevailing parties. (See *Bullock* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094 [271 Cal.Rptr. 44].)

## IX

The judgment and the order awarding attorneys fees are reversed with directions to the trial court to enter an order denying the writ petition. Costs are awarded to the defendants.

Carr, J., and Sparks, J., concurred.

A petition for a rehearing was denied February 11, 1992.